```
                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
                    SOUTHERN DIVISION - SANTA ANA
```

```
KURT MORALES, II, ET AL,      ) CASE NO: 8:24-mc-00010-FWS-DFM
                              )
             Plaintiffs,      )         CIVIL MISCELLANEOUS
                              )
     vs.                      )        Santa Ana, California
                              )
VAJIRA SAMARARATNE,           )     Thursday, February 27, 2025
                              )     (10:00 a.m. to 10:48 a.m.)
             Defendant.       )     (10:56 a.m. to 11:01 a.m.)
```

HEARING RE:

ORDER TO SHOW CAUSE
WHY DEFENDANT SHOULD NOT BE HELD IN CIVIL CONTEMPT [DKT.NO.25]

BEFORE THE HONORABLE FRED W. SLAUGHTER,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Plaintiffs:          MARK L. JAVITCH, ESQ.
                         3 East 3rd Avenue, Suite 200
                         San Mateo, CA 94401
                         650-781-8000

For Defendant:           DANIEL S. SILVERMAN, ESQ.
                         Venable, LLP
                         2049 Century Park East, Suite 2300
                         Los Angeles, CA 90067
                         310-229-9900

Court Reporter:          Recorded; CourtSmart

Courtroom Deputy:        Rolls Royce Paschal

Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1    **Santa Ana, California; Thursday, February 27, 2025; 10:00 a.m.**

2                                  --oOo--

3            **THE CLERK:**  Calling item number 1, SAMC 24-00010-FWS,

4    Kurt Morales, II, et al versus Vajira Samararatne.  Counsel,

5    please state your appearances.

6            **MR. JAVITCH:**  Good morning, Your Honor, Mark Javitch

7    on behalf of plaintiff Morales.

8            **THE COURT:**  Thank you, good morning.

9            **MR. SILVERMAN:**  And good morning, Your Honor, Dan

10    Silverman on behalf of the respondent, Mr. Samararatne.

11            **THE COURT:**  Thank you.  And your client is also

12    present.

13            **MR. SILVERMAN:**  Correct, Your Honor.

14            **THE COURT:**  All right.  Thank you.  I just want to

15    make sure that's all clear for the record.  Today we are using

16    the recording device, rather than a court reporter.  Please

17    make sure to everyone that you're speaking slowly, clearly and

18    loudly into the microphone.

19            Also since we're not in trial, I'll -- in my

20    discretion allow you to present at counsel table, or at the

21    lectern, or you may go to the lectern, you may be seated or

22    standing.  It would be all at the lectern and standing at

23    trial, so just know that if you're ever in a trial in this

24    court, it's more of a formal court, so keep that in mind.

25            And in terms of the questions today, I do have some

```
 1   surgical questions and I say surgical because they're direct
 2   questions.  Please make sure you listen to the question posed,
 3   not to the question that you thought would be posed and that
 4   you want to answer, because I will, if I have to interrupt, to
 5   keep this on track for what the Court's questions are.
 6           If this was a trial and I was an attorney, I'd say
 7   objection, non-responsive, but I'm -- we're not in trial.  So
 8   keep that in mind as we go through this.  And if you don't
 9   understand a question or need clarification, please let me
10   know.
11           The Court first will inform the parties that I have
12   reviewed the docket and the materials, the materials from the
13   magistrate judge, thank you.  And the Court is going to start
14   with some questions and I then may take a break to consider the
15   answers I've heard thus far, to apply it to the law and look at
16   the materials from the magistrate judge as well.
17           So in summary from the In Re Dual-Deck, so that's D-
18   U-A-L-Deck, D-E-C-K video cassette recorder anti-trust
19   litigation case, 10 F3d 693 at 695, specifically, a Ninth
20   Circuit case from 1993 for contempt to be found, it is that the
21   -- there was a violation of a specific and definite court
22   order.  It was beyond substantial compliance and not on good
23   faith and reasonable interpretation of that order.
24           So I'm first going to focus on substantial
25   compliance.  There are two issues I'm going to start with here.
```

4

```
 1   First, I'm going to turn to respondent.  When was there

 2   notification about the July 8th, 2024 order, based on your

 3   thoughts?

 4             MR. SILVERMAN:  I'll go to the lectern, Your Honor.

 5             THE COURT:  That's fine.

 6             MR. SILVERMAN:  Yeah, in a nutshell, Your Honor,

 7   there's been a lot of miscommunication and misunderstanding

 8   here, but the answer, the blunt answer to your question is, the

 9   first time Mr. Samararatne knew of the July 8th order was when

10   he was served by the marshal on January 7th, 2025.  And I can

11   give you the history of why he didn't know about the motion to

12   compel, he didn't know about the hearing in July 2, he didn't

13   know about the July 8th order, he didn't know about the motion

14   for contempt that was filed in September and the hearing that

15   took place in November because there was a counsel, Stephen

16   Dargitz was counsel for Pelican Investment Holding, the

17   underlying case in Delaware, TCPA case filed in Delaware.

18             Mr. Samararatne was -- became part owner of that

19   company, but he wasn't a party to it and this subpoena was

20   served in December of '23 to -- asked him to produce -- asked

21   Mr. Samararatne to produce documents.  He complied with that.

22   He retained his Delaware counsel.  The Pelican's counsel in

23   Delaware and complied with the subpoena, because that subpoena

24   was served on him.

25             He responded.  He then provided amended responses.
```

5

1    The plaintiff's counsel were not satisfied with those

2    responses.  They filed a motion to compel.  Mr. Samararatne had

3    no knowledge of the motion to compel.  And, in fact, they

4    weren't even able to serve him with the motion to compel.  The

5    hearing on that motion was supposed to be held on May 14th of

6    '24.  And plaintiff's counsel were not able to serve him, so

7    they filed a motion to serve by alternative means and there was

8    a hearing held on I believe June 11th and nobody appeared on

9    behalf of Mr. Samararatne.  And the Court ordered at that time,

10   the magistrate ordered, that Mr. Dargitz who was not counsel of

11   record, he hadn't filed a notice of appearance, he is a counsel

12   in Delaware did not pro hac into this case, that he appear at

13   the July -- at a July 2 hearing.

14          So he appeared at that hearing.  And the July 8th

15   order came down and Mr. Dargitz, D-A-R-G-I-T-Z, was made --

16          **THE COURT:**  Maybe just a little bit slower for the

17   record, because if this is transcribed, that's going to be

18   quite a task, you're going at a -- I don't know if it's 350,

19   400 words per minute.  A little bit slower, please.

20          **MR. SILVERMAN:**  I'll slow down, Your Honor.

21          **THE COURT:**  Thank you.  And again, we have two

22   matters on, so we will have the time, so don't feel like I'm

23   cutting you off.

24          **MR. SILVERMAN:**  I appreciate that.

25          **THE COURT:**  I'm not interrupting.  I'm -- I allowing

1    -- I asked one specific question, you then said I can tell you

2    about it, I didn't stop you and I'm allowing you to go beyond

3    the question right now --

4            **MR. SILVERMAN:**  Right.

5            **THE COURT:**  -- but just know that I -- at least next

6    time probably if you say would you like me to go beyond that,

7    wait for the Court's response.

8            **MR. SILVERMAN:**  Understood.

9            **THE COURT:**  So, yes, you may go beyond that and I'm

10   retroactively applying that and I'm ratifying that to the fact,

11   appreciate the smiles.

12           **MR. SILVERMAN:**  All right.

13           **THE COURT:**  Thank you.  Please continue.  I'm

14   listening and taking notes.  And just remember, when I'm

15   listening, if you're talking too fast where I can't hear you,

16   because you know, you're talking for yourself, because you're

17   so used to this, I'm asking a question so I can absorb it.

18           **MR. SILVERMAN:**  Okay.  I will slow down, Your Honor.

19           **THE COURT:**  So if you're talking so fast, ever seen a

20   movie where like things are going by and you're like, what

21   happened, and you're in the theatre so you can't run it back.

22           **MR. SILVERMAN:**  Yeah, I do.

23           **THE COURT:**  So slow down, because the Court listens

24   to every word.  That's why I have oral argument.  I don't have

25   it just to push a button and say I've done oral argument, I'm

1    actually valuing everything, so that's to everyone in the

2    audience too, please make sure, slowly, clearly and loudly.

3    Thank you so much, I hope that helps.

4         **MR. SILVERMAN:**  I appreciate that, Your Honor.

5         **THE COURT:**  Please continue on.

6         **MR. SILVERMAN:**  So July 8th order came out.

7    Mr. Dargitz was aware of the order.  He informed

8    Mr. Samararatne's assistant of the order, who then told in

9    house counsel about it, and told her to take care of it.

10        Mr. Samararatne was never informed of it and that's

11   why I said at the outset, there was a miscommunication and a

12   misunderstanding because their -- his counsel who made a

13   special appearance knew of the order, but that order never was

14   transmitted to Mr. Samararatne.  So he knew nothing about it at

15   all.

16        And again, I'll fast forward, but because the order

17   wasn't complied with since he didn't know about it, he had

18   thought his amended responses to the document requests were

19   sufficient and adequate.  The vast majority of the responses,

20   he said he had no responsive documents.  And as to a handful or

21   three actually, he said the only documents that I have that are

22   responsive are the same documents that Pelican produced earlier

23   in the case.  I have nothing new to produce.

24        So he assumed everything was fine.  Then the motion

25   for contempt was filed in September.  Mr. Samararatne knew

8

1  nothing of that.  In fact, that motion was filed in September

2  and Mr. Samararatne was overseas on business travel in Japan

3  and Shri Lanka and didn't return until after Christmas.

4        And then the hearing took place in November, and

5  again since he didn't know about the motion, he didn't attend

6  the -- he didn't oppose it and he didn't attend the hearing.

7  The motion to, you know, for contempt.  And so order was issued

8  by the Magistrate on November 21, issuing the order to show

9  cause and then that's the order in which Your Honor is citing

10  the Dual-Deck case.

11        And the order, that order gave -- said that the

12  marshal shall serve the order on Mr. Samararatne, not on his

13  lawyer, not on Mr. Dargitz, but on Mr. Samararatne personally

14  and once that's served Mr. Samararatne has 30 days to comply,

15  meaning the order was to supplement his responses and to sign a

16  verification under penalty of perjury that the answers he

17  provided are true and correct and to -- and if he didn't have

18  responsive documents, to state that, after a diligent search

19  and a reasonable inquiry, he has no responsive documents.

20        The marshal came to Mr. Samararatne's home on

21  December 20th, at a time when Mr. Samararatne was in Shri Lanka

22  on both business and personal family matters.  But

23  Mr. Samararatne saw the Ring doorbell.  He communicated with

24  the marshal and the marshal said I have some type of an order

25  or something for you, didn't specify exactly what it was.

1    Mr. Samararatne said, I'm in Shri Lanka, I'm out of the

2    country, I'll be returning on the 26th.

3              The marshal said no problem, I will serve it upon you

4    when you return.  I think the marshal was on vacation or was

5    going to be on vacation.  The bottom line was, Mr. Samararatne

6    after he landed, was in constant communication with the

7    marshal.  And, in fact, agreed to meet him, rather than at his

8    house, meet him at his business office and accept service of

9    the order on January 7th.

10             That was the first time, January 7th, 2025 was the

11   first time Mr. Samararatne knew of any of this, that there had

12   been an issue -- a motion to compel was filed, that there was a

13   hearing on contempt and that the order to show cause regarding

14   contempt had been issued.  He knew nothing about this.

15             And immediately upon learning of this, January 7th,

16   he had 30 days to respond and provide a supplemental response

17   under penalty of perjury --

18             **THE COURT:**  Please just a bit slower, it's starting

19   to speed up again.

20             **MR. SILVERMAN:**  I apologize.

21             **THE COURT:**  Thank you.  Oh, and no need ever to

22   apologize, I'm just trying to make sure we have a good record.

23             **MR. SILVERMAN:**  Okay.  Understood.

24             **THE COURT:**  I have to be told that, for many years, I

25   can tell you a story about a jury trial I did in 2001 where the

1    court reporter said her fingers were on fire, I was talking too

2    fast in front of the jury and to slow down.  There's a story.

3         So this is all very -- I try to keep it very positive

4    in here, but I'm listening, but you're going faster and faster.

5    We all need to be reminded of that.  You're -- I appreciate you

6    have these facts down very well, but I'm trying to make sure

7    that everything's addressed, and I may start breaking this up a

8    little bit because I may want to hear from the other side too,

9    and it's becoming almost like a trial, full narrative.  Okay?

10        **MR. SILVERMAN:**  I'm 30 seconds from the end.

11        **THE COURT:**  Okay.

12        **MR. SILVERMAN:**  January 7th he gets served.  He is

13    shocked by the order.  He retains me immediately.  I file a

14    notice of appearance and we respond.  He does a diligent

15    search, reasonable inquiry, checks his servers, checks his e-

16    mails, does word searches, et cetera, contacts various people

17    to find out if they have documents to make sure he is in full

18    compliance and then we serve timely, in fact, we served them

19    early, supplemental responses to the document requests, in

20    which with the exception of three of the requests, he said he

21    has no -- after a diligent search and a reasonable inquiry, he

22    has no responsive documents.

23        And that was after he did a -- spent hours

24    exhaustively making sure he had nothing compliant or

25    responsive, and as to three of the requests, just as he had

```
 1    done a year earlier in his amended responses, he produced the
 2    documents that Pelican previously produced, which he already
 3    said that's all he had.  And so that's why the Pelican
 4    production was the same as Mr. Samararatne's production,
 5    because he said I have nothing further.
 6            And we produced those on February 5th.  And since
 7    that time, counsel reached out to me and I promptly responded
 8    and we met and conferred.  But the bottom line is, once
 9    Mr. Samararatne learned of all this, he's been fully compliant
10    and has complied with the Court's order to a tee, in fact, we
11    responded early to the order.
12            So, you know, I can get into further issues about
13    whether contempt is warranted under the law, given his
14    responsiveness, but I'll sit down for now and address that
15    later.
16            THE COURT:  All right.  Well, I may have follow up
17    questions.  But again, as I said at the beginning, be
18    responsive only to the question that's posed.  If I ask you,
19    for example, what color the house is.  It may be brown, but
20    what I've heard now is I've heard about title company, I've
21    heard about the plumbing, I've heard about the county, I've
22    heard about everything.
23            So again, the Court in its questioning is going to
24    have a certain focus.  So from here on out, I appreciate that,
25    I'd ask you to just answer the question posed and then I will
```

12

```
 1   open it up at some point and say, is there anything else you'd

 2   like to say not in response to the Court's question that you

 3   think the Court should know.  Okay?

 4           MR. SILVERMAN:  Okay.

 5           THE COURT:  But I think I did say that at the

 6   beginning --

 7           MR. SILVERMAN:  You did, I just --

 8           THE COURT:  -- that it was going to be surgical

 9   questions.  But I appreciate that.

10           MR. SILVERMAN:  I understand that.

11           THE COURT:  And again, the Court's super positive,

12   always wants to make sure everyone has a chance to be heard,

13   but I also want to make sure that people can follow the Court's

14   instructions as well.

15           MR. SILVERMAN:  I just wanted to -- I apologize.  I

16   want to make sure though when I told you at the outset, he

17   didn't know of the July 8th order until January 7th, that there

18   might be skepticism on the Court's part, so I wanted to explain

19   the why.

20           THE COURT:  Here's another thing, don't try to read

21   the Court's mind.

22           MR. SILVERMAN:  Okay.

23           THE COURT:  There might be skepticism.  There might

24   not be.

25           MR. SILVERMAN:  Okay.
```

13

1              THE COURT:  Who knows.  Just if I say I just want the

2    question asked/answered, that should probably divert away

3    anything.

4              MR. SILVERMAN:  Okay.

5              THE COURT:  It sounds like you're overruling what the

6    questions -- what the Court wanted to do.

7              MR. SILVERMAN:  Okay.

8              THE COURT:  Does this kind of sound like that?  A

9    little bit.

10             MR. SILVERMAN:  I was just --

11             THE COURT:  It sounds like you want to have the

12   questions answered your way.

13             MR. SILVERMAN:  Well, I just wanted to have the Court

14   have the full information of an explanation.

15             THE COURT:  True, true.  But especially if the Court

16   instructs you, I need you to follow the Court's directions.

17   Okay?

18             MR. SILVERMAN:  Thank you, Your Honor.  Nothing

19   further.

20             THE COURT:  Okay.  Let me figure some things out.

21   You talked very quickly.  Let's go through and just make sure

22   that everyone for the record, say a reviewing court is look at

23   what you just said, you said a bunch of names, things that

24   happened, I didn't have a chance to catch up, because we always

25   want to make sure the record is readable so people aren't

14

```
 1   having to look all over the place to say, who is that, when was

 2   that, just so it's very linear in some ways.

 3              So you mentioned the previous attorney, you talked

 4   about other actions.  Let's go through those a little bit

 5   slower.

 6              MR. SILVERMAN:  Okay.

 7              THE COURT:  Tell me the name and spell for the

 8   record.  So this is being recorded, and so someone is going to

 9   have to transcribe this too.  So names, it may be a common

10   name, maybe you don't have to transcribe, but tell me the name

11   of the previous attorney who was receiving the materials for

12   the record.  I can answer it, but I'm not going to testify

13   here.  You're the one who's going to be giving that

14   information.

15              Tell the name, please, first and last name for the

16   record, counsel that was apparently receiving this, also the

17   name of the assistant who received it, so we've got to slow

18   down.  Do you see what I mean?

19              MR. SILVERMAN:  Got it.

20              THE COURT:  Okay.  One by one, first, the name of the

21   attorney who was receiving it, who you're saying only made a

22   special appearance and then I'll ask you about that special

23   appearance too.  I'm listening but it's going very quickly.

24              MR. SILVERMAN:  His name is Stephen Dargitz.

25              THE COURT:  Spell the name, please, and slower,
```

1   please.

2          **MR. SILVERMAN:**  Stephen, S-T-E-P-H-E-N, I believe

3   it's Dargitz, D-A-R-G-I-T-Z.

4          **THE COURT:**  And just tell me who this attorney was

5   and what his role was, just so the record's clear.  I may have

6   that information already, but I'm trying to make sure if I have

7   a question following up with plaintiff, everything's on the

8   playing field for us to talk about.  So we just are going bit

9   by bit.

10         Tell me a little more about this and who this person

11  was and what this person's doing now, what relation they have

12  to this case.

13         **MR. SILVERMAN:**  He was the lawyer for Pelican

14  Investment Holdings in the underlying TCPA lawsuit that's been

15  pending in the District Corut of Delaware since 2020.

16         **THE COURT:**  Thank you.  Is he still counsel of

17  record?

18         **MR. SILVERMAN:**  He is but --

19         **THE COURT:**  All right.  So let me ask you this.  You

20  said that he made a special appearance where?

21         **MR. SILVERMAN:**  Well, the Court ordered him to make a

22  special appearance.  He had -- the subpoena was served in 2023

23  on Mr. Samararatne personally seeking documents relating to the

24  underlying TCPA case in Delaware.  Mr. Dargitz provided

25  responses to that subpoena, just like a document request and

16

1   then he amended those responses in March of '24.

2          But at the June 2024 hearing, he didn't appear, he

3   hadn't made a notice of appearance, hadn't pro hac'd in, the

4   Court ordered --

5          **THE COURT:**  Notice of appearance in which particular

6   case?  Again, you can see I'm going bit by bit, I'm looking at

7   the record.  There's a lot of just -- this is almost like

8   you're presenting to yourself, not to -- I always say when you

9   have -- you want to tell a story maybe to a jury, you talk like

10  you're talking to a very smart young person, you know, don't

11  assume that I know everything, but I'm trying to lay everything

12  out so we can have a dialogue about this, so that everything

13  can be answered.  Also, the other side gets a chance to

14  respond.

15         **MR. SILVERMAN:**  Understood.  He was ordered at the --

16  there was a June hearing in this matter, in the matter

17  involving the motion to compel.

18         **THE COURT:**  Yes.

19         **MR. SILVERMAN:**  Mr. Dargitz wasn't there.  They

20  weren't able to serve Mr. Samararatne, in fact, they filed a

21  motion for alternative service.  At that hearing, the

22  magistrate ordered that the hearing be postponed till July 2nd

23  and that plaintiff's counsel inform, serve Mr. Dargitz and

24  ordered that he appear at that July 2nd motion to compel

25  hearing.

17

1          **THE COURT:**  All right.  And so again, I'm just

2     asking, there's an -- you're saying that the Court ordered him

3     to only be a special appearance as to this one matter, but then

4     is ordering him to facilitate the Court's order.  Is that what

5     I'm hearing?

6          **MR. SILVERMAN:**  Yes.

7          **THE COURT:**  I'm trying to understand the special

8     appearance and what the significance of why you're calling it a

9     special appearance and what supports that or or if it -- he's

10    fully, it sounds like counsel of record in the past.  And so

11    now on this particular matter he is in some ways put in a

12    different classification, a special appearance, which means

13    that for only some certain purpose of the case he's going to be

14    there or is appearing for someone else.

15         **MR. SILVERMAN:**  Yeah.

16         **THE COURT:**  So I'm just trying to understand what you

17    meant by that.

18         **MR. SILVERMAN:**  Well, and I may be using the term

19    special appearance loosely.

20         **THE COURT:**  And you know what, every word counts.

21    I'm going to listen to everything.  And so when I hear a word

22    or I hear something, that's what I'm going to ask questions

23    about.  So what do you mean by special appearance?  I'll give

24    you a special appearance usually that I would see.

25              Say I'm back in state court and there's a criminal

1    arraignment.  And there's an attorney who comes in and says,

2    I'm special appearing for the attorney of record, but I'm just

3    here to do the arraignment process but the other person's

4    actually the attorney of record, but I'm just doing this kind

5    of ministerial type thing.

6            A special appearance is -- has kind of a term of art.

7    That's just an example.  I'm sure there's others.

8            **MR. SILVERMAN:**  Well, what I meant by special

9    appearance was, he's a Delaware lawyer.  He was the lawyer for

10   Pelican in the underlying Delaware case.  His role here was

11   simply to respond to discovery.  The Court ordered him to

12   appear at the July 2nd hearing.  So he hadn't filed a notice of

13   appearance, he hadn't filed a pro hac vitae application, but

14   because the Court ordered at the July 11th hearing that he

15   appear at the July 2nd hearing, that's what I mean by a special

16   appearance, is that per court order he appeared at the July 2nd

17   hearing.

18           **THE COURT:**  I do understand that.  That has a

19   different meaning to me than a special appearance.

20           Okay.  Thank you.  Thank you for that clarification,

21   because again I'm listening to every word you're saying.

22           All right.  So I am going to now turn to your

23   colleague the plaintiffs, so thank you so much.

24           **MR. SILVERMAN:**  Thank you.

25           **THE COURT:**  I will turn to you and, Mr. Javitch, how

1    you doing today?

2         **MR. JAVITCH:**  Good, thank you, Your Honor.

3         **THE COURT:**  Thank you.

4         **MR. JAVITCH:**  Appreciate it.

5         **THE COURT:**  You've heard a lot of what you've heard

6    from Mr. Silverman.  And I appreciate all that's been said thus

7    far.  What I'm going to do for fairness sake is I'm going to

8    amend my previous order, I'm going to allow you to say anything

9    you'd like in response and do a narrative too, because I want

10   to make sure it's fair to both sides.  But then after this

11   question, I'll start going back to it.

12          And again, I just want to get the information, but I

13   have to have an even playing field for both sides.  So first,

14   I'll open it up to you and ask the same question I asked

15   before, but you can respond in a narrative, covering areas that

16   you heard from your colleague.  Also that you've heard

17   questions from the Court as well, and that question is, what is

18   your thought as to when Mr. Samararatne found out about the

19   July 8th order.  Thank you.

20          **MR. JAVITCH:**  Well, I think he was informed through

21   counsel Dargitz, which we forwarded -- Mr. Dargitz attended the

22   July 2nd hearing on behalf of Mr. Samararatne and then the

23   Court issued the July 8th order.  July 10th, I e-mailed a copy

24   of the Court's order to Mr. Dargitz.

25          The reason why we think that -- actually the

1  plaintiffs initially were bringing a motion for alternate

2  service.  We had mailed, e-mailed, tried to hire process

3  servers with no luck.  And then at the hearing, Judge McCormick

4  noticed that -- and raised the idea that Mr. Dargitz had been

5  meeting and conferring pretty substantially on behalf of

6  Mr. Samararatne in response to the subpoenas.

7           So when we actually heard from Mr. Dargitz with a

8  response to the subpoena, so he was -- Mr. Dargitz was fully

9  representing Mr. Samararatne during our 37-1 meet and confer

10 process.  He served responses, he served amended responses.  We

11 exchanged several e-mails about requesting to meet and confer

12 on the phone under 37-1.  Mr. Dargitz would not agree to meet

13 on the phone.

14           And then there was nothing that broke the

15 relationship with his client.  We asked what would be an

16 address to serve.  We asked Mr. Dargitz can you accept service

17 on behalf of Mr. Samararatne.  We never heard back.  We asked

18 him, can you give us the address for service for

19 Mr. Samararatne.  We never heard back from him.

20           So then Judge McCormick thought that Mr. Dargitz was

21 fully still representing Mr. Samararatne at the July 2nd

22 hearing and there was nothing informed to Judge McCormick to

23 say that there was -- that the relationship had been severed.

24           So he had constructive -- or he had actual notice

25 through informing Mr. Dargitz.

1          **THE COURT:**  Okay.  So I have to ask this question

2     then.  This sounds like is premised and is under the assumption

3     that Mr. Dargitz, and again is D-A-R-G-I-T-Z actually did what

4     was ordered of him and served Mr. Samararatne.

5          What is the evidence that you have that that

6     happened, as opposed to the inference that, or kind of like a

7     mail box rule, you put something in the mail box, there's a

8     presumption that it arrives.

9          What's -- is there some type of assumption or

10    presumption that -- or evidence to what -- that Mr. Dargitz

11    actually followed through?

12         **MR. JAVITCH:**  Well, the evidence is that he -- we

13    said -- I e-mailed the July 8th order to all the underlying

14    counsel and then I e-mailed it again to Mr. Dargitz and said,

15    would you be sure to send a copy to Mr. Samararatne's last

16    known e-mail address and he said that he would.  That's the

17    only evidence we have.

18         **THE COURT:**  All right.  Thank you.  I'm going to move

19    now to my next question area and this is going to now, if I

20    could turn now back to Mr. Silverman, thank you.  Appreciate it

21    from both sides.

22         To you and I don't know if you're going to go to the

23    lectern or not.

24         **MR. SILVERMAN:**  I'll go to the lectern.

25         **THE COURT:**  Okay.  Thank you.  On behalf of your

1    client, is it your position that once you or your client found

2    out about the July 8th order, that there has been substantial

3    compliance by substantially complying with the subpoena?

4         I heard some of your answer before, you talked about

5    it.  But now I'm on that specific question, so we can focus

6    only on that and just know that I'm going to turn to plaintiff

7    afterwards and ask you about what evidence that you have about

8    not substantially complying.  And again, I would always ask

9    everyone to base their response on evidence.  Thank you.

10        **MR. SILVERMAN:**  The answer is, Your Honor, very

11   bluntly absolutely yes.

12        **THE COURT:**  Can you tell me why?  Thank you.

13        **MR. SILVERMAN:**  The order was served on January 7th.

14   Mr. Samararatne immediately --

15        **THE COURT:**  Okay.  Let's make sure we have the dates

16   just -- I was just waiting for you to say to 2025.  January

17   7th, 2025.

18        **MR. SILVERMAN:**  January 7th, 2025.  Yes.

19        **THE COURT:**  Okay.

20        **MR. SILVERMAN:**  The marshal served Mr. Samararatne on

21   January 7th, 2025 with the order.

22        **THE COURT:**  What happened then?

23        **MR. SILVERMAN:**  Shortly thereafter, Mr. Samararatne

24   reached out to me and retained me as counsel.

25        **THE COURT:**  Then what happened?

1          **MR. SILVERMAN:**  I then instruct -- met with him and

2    instructed him to search his database, search his servers, do

3    word searches, contact various people at Pelican, his partners

4    at Pelican because the order required that he state whether he

5    had possession, custody or control of documents.  So even if he

6    didn't have possession or custody of them, if he had control,

7    e.g. through others at Pelican, he was obligated to produce

8    those documents.

9          He spent hours scouring his e-mails, his servers,

10   doing word searches, contacting again various people at

11   Pelican, a gentleman named Gus Rene, a gentleman named -- I

12   believe his name is Ron Edington.  I believe he contacted his

13   in-house lawyer.

14         So he spent quite a bit of time making sure he was

15   compliant and then we met.  And he told me, as I stated earlier

16   in my amended responses, with the exception of the three

17   requests to which Pelican already produced responsive

18   documents, I have nothing else.

19         And in the order that the judge issued, Judge

20   McCormick issued on July 8th, he said, respondent's objections

21   are overruled, in particular respondent's objection that any

22   documents within his possession, custody, and control have

23   already been produced by Pelican is overruled, and any such

24   documents within his possession, custody or control shall be

25   produced.

1        So the judge -- Judge McCormick said that I
2  understand you're telling me that Pelican produced these
3  documents and you're not producing them because what's the
4  point of producing documents that you already have, we then
5  produced those documents as well, which is why there's no
6  surprise that the documents we produced, Mr. Samararatne
7  produced on February 5th were the same documents Pelican
8  produced.

9        So to go back to your question, he was absolutely
10  vigilant in his search and we were compliant to the tee,
11  including him signing a verification under the penalty of
12  perjury that his response -- that he did a complete search and
13  that he had no documents other than the Pelican produced
14  documents in his possession, custody or control.  So the answer
15  is absolutely yes.

16        **THE COURT:**  Thank you.  I have no more questions.
17  You actually -- your last part answered my follow up question,
18  so thank you.

19        I'm going to turn to your colleague, thank you.

20        And so turning to you, Mr. Javitch, your response to
21  that I'll allow it to be open first and then I also want you to
22  make sure you handle the issue of there has been things turned
23  over, even the things that have been turned over, the three
24  items, but also then that there's been a verification under
25  penalty of perjury saying there's no more, I don't have it, and

1    then we'll do some follow up questions.  Thank you.

2            **MR. JAVITCH:**  Thank you.  Well, unfortunately, the

3    responses are simply conclusory and we -- sticking to the

4    evidence, we have e-mails from the other defendants that were

5    sent by Mr. Samararatne.  We have e-mails right here, I can

6    show you that have two e-mail addresses that he has that would

7    be responsive.  So the responses should state what happened to

8    those, were they deleted or destroyed.

9            RFP 3 requested communications with other defendants.

10   RFP 32 requested call detail logs.  We know that he settled --

11   Mr. Samararatne settled an enforcement action with the Ohio

12   Attorney General for telemarketing violations.  And we

13   requested in RFP 19 all documents related to the enforcement

14   action.

15           The -- we know there was a VICIdial account.  We know

16   there was another telephone company produced.  So the

17   objections about custody and control were overruled, but then

18   he just didn't search where the documents were likely to be

19   held and said, well, it's my -- it's the bank's money, it's not

20   my money.  But, you know, we have -- there's just no

21   explanation for not being able to find, if you know there was a

22   settlement and you know there was call logs and you know there

23   were e-mails, the responses are just entirely conclusory.

24           **THE COURT:**  All right.  So let's go to evidence and I

25   do understand some of what you said thus far.  But what is the

1    evidence that Mr. Samararatne has not substantially complied

2    with the subpoena?

3          I've heard that you've heard from other employees,

4    you talked about e-mails, you've talked about settlements,

5    things of that nature.  But what is the -- that in some ways

6    could be viewed as argument, but what is that that the Court

7    can then look to and contend and make a determination that this

8    is real, this was really here, and this is the proof that it

9    was really here as opposed to we think it was here.  And if you

10   have something that's verified, what can the Court do more

11   rather than allow the process to go forward, for example, and

12   find out, yes, there was, and then enforce perjury, for

13   example.

14         Who -- I mean, what is that that would help the Court

15   make a determination here because it is a factual determination

16   I would assume of substantial compliance.  And I have to do it

17   by the record and then there is the burden that you have to

18   prove this and whether that burden's met or not.  Does that

19   sound about right?

20         **MR. JAVITCH:**  Sounds right.

21         **THE COURT:**  So walk me through this.

22         **MR. JAVITCH:**  Sure.  Well, we met and conferred

23   promptly after we received the amended responses from

24   Mr. Samararatne and we said -- we asked, can you disclose any

25   details about the search.  We know there was a VICIdial

1    account, we know there was another company, did you search

2    those.  They wouldn't respond.

3            We have an e-mail written from Mr. Samararatne to the

4    other defendants instructing them about Pelican from November

5    29th, 2022.  So was this e-mail lost or destroyed or what

6    happened to it, it doesn't say in the responses.

7            And then we have, according to the Attorney General

8    of Ohio's website, we have Franklin County Court of Common

9    Pleas, Case No. 23-cv-00047, which was settled with Pelican and

10   Mr. Samararatne on a personal basis, several other companies.

11   Mr. Rene, the other, Ronald D. Edington, which is also a person

12   that was just named.

13           So what happened to these -- what happened to the

14   documents with the Attorney General of Ohio?  Were those

15   destroyed, lost, were they not searched for?  It's, as a matter

16   of law, you're not allowed to just state that you conducted a

17   reasonable search without enough information for the Court to

18   determine whether that search was actually done with due

19   diligence.

20           **THE COURT:**  I do understand that.  That's going to

21   make me go back to Mr. Silverman.

22           Mr. Silverman, I'm going to ask you to respond.

23   You've heard some of the evidence and essentially, what I'm

24   hearing a lot is that there were not -- there was not enough

25   information provided that shows that the search was done, given

1    the information they have, that it's conclusory, just basically

2    I think I heard this one time, the stonewall answers to the

3    discovery requests.  I don't have it, too bad.  That's probably

4    an exaggeration, but that is kind of the net result, if you

5    wanted to say it, it's just no, I don't have it, I looked, it's

6    not there.

7          But if there's evidence that the Court finds, and

8    this is an if and a hypothetical that shows that well, whether

9    you give a verified response or not, it doesn't look like

10   you've done enough.  That's not substantial compliance then or

11   something, for example.

12         Or how do you respond, what should the Court do in

13   that type of situation?  And again, if you're saying that, you

14   know, the plaintiff is saying here, we don't feel like you

15   answered the questions and you're saying yes, we did, what if

16   the Court says, it does sound conclusory.  I want to have more

17   information that if you're saying, did you look for -- you

18   know, here's all this information, did you do all these things,

19   and he said, no, I didn't.  Or, no, it's not there is a better

20   answer, what's the Court supposed to say because this is going

21   to be based on evidence.

22         And if someone has at least something that's going

23   down that road and it just gets a conclusion of no or just the

24   boilerplate kind of answers of like, I looked, it's not there.

25   Is that going to satisfy the Court?

1              **MR. SILVERMAN:**  Your Honor, well two things.  First,

2    as to the letter of the order and then I'll explain why -- what

3    the search that was done was more than sufficient.

4              The order requires, that we complied with, within 14

5    days of this order or 30 days of the January 7th service,

6    respondent shall serve supplemental responses to plaintiff's

7    subpoena and produce all responsive documents if following a

8    diligent search and reasonable inquiry respondent has no

9    responsive documents in his possession, custody or control, he

10   shall indicate in his supplemental responses and the responses

11   shall be verified by respondent under penalty of perjury.

12             That's precisely what we did.  We complied with the

13   letter of that order.  In terms of whether documents once

14   existed, but no longer exists, there's nothing in the order

15   that says that we have to say, they may have once existed but

16   we no longer have them.  But what Mr. Samararatne did, as part

17   of his diligence, not only did he search his own servers, his

18   own e-mails, his own documents, as I said earlier, he reached

19   out to Gus Rene and Ron Edington I believe is his name.

20             And Gus Rene informed him, that I believe it was a

21   fire, I think I had originally told counsel a theft, but I

22   think there was a fire and the documents, I don't know what

23   existed or didn't, but there was a fire and the servers were

24   lost.

25             So there may have been potentially responsive

30

1    documents that Gus Rene had.  He's also one of the Pelican

2    partners, but they don't exist anymore.  So it's hard to know

3    what existed and got destroyed versus what never existed and

4    there's no way to determine that.  But as part of

5    Mr. Samararatne's due diligence, he reached out to Gus Rene to

6    ask him where these documents were.

7          Now plaintiff's counsel served similar requests,

8    document requests in the underlying Delaware action on Pelican

9    Investment itself.  And some of these documents that counsel is

10   referring to were questions that were asked or documents

11   requested of Pelican.  And Pelican, the entity, not

12   Mr. Samararatne individually provided responsive documents and

13   it said, there are no documents in our possession, custody and

14   control with the exception of these 15 pages that were produced

15   by Pelican and the same 15 pages were produced by

16   Mr. Samararatne.

17         So the short answer is, one, he substantially

18   complied, in fact, he complied to the letter of the order.  And

19   second of all, on top of that, as I informed counsel during our

20   meet and confer that took place shortly after it was produced,

21   he reached out to Mr. Rene, I told counsel that, and I believe

22   in my conversation I was misspoken and I thought there was a

23   theft, I subsequently learned I believe it was a fire, but the

24   documents and the servers were lost.

25         So again, the documents relating to the Ohio

1    enforcement action that they're asking about, they may have

2    been on that server of Pelican that was lost.  But

3    Mr. Samararatne searched, he doesn't have them.  And I can go

4    down each of the requests and give the same answer.  But the

5    point being is, he spent hours doing searches on his e-mail, on

6    his servers, and contacting others to find out whether they --

7    he had possession, custody or control at that time.

8          He cannot possibly know whether or not they existed

9    at one time.  All he can do is find out whether they currently

10   exist and to produce them.  So he's complied substantially to

11   the letter and to the spirit of the order.

12          **THE COURT:**  All right.  I do appreciate that.  And so

13   I will just call that, that there's been compliance to the

14   letter of the order given the definitions and the wording of

15   the order.

16          So thank you on that.  Just your response, really

17   quick, Mr. Javitch, that if there was all of this technical

18   compliance, and I say technical because of the argument as to

19   the letter of the order, you know it says, you know, you have

20   to be at the bus stop by 10 a.m. and you're there at 9:59.

21   Maybe it would've been easier if it was at 9:55, but it was

22   9:59.  That does comply with the letter.

23          So if there has been a search and things are gone,

24   say that there's a subpoena for this videotape that showed a

25   robbery and you're asking for it for a year later and the

1    videotape has been written over now 50 times, you know, because

2    they have one tape that just keeps running in a loop.  And I

3    looked, it's not there anymore.  But the letter says, you have

4    to provide it if you have it.  Does that show substantial

5    compliance?

6              **MR. JAVITCH:**  Well, I think there is a literal -- I

7    think if you read it literally with no other significance

8    behind the words, but if you look at what the words actually

9    mean, I don't think there's substantial compliance.

10             There's just no explanation for why do you need to

11   rely on a third party when you were the person who settled.

12   Why wouldn't you write in your responses that those documents

13   were lost in a fire?  And by the way, this is the second server

14   that was lost in this litigation.  There was another server

15   that was also wiped inadvertently coincidentally.  So --

16             **THE COURT:**  Is that something that this Court can

17   help at this stage?  I mean again, I hear this --

18             **MR. JAVITCH:**  No.

19             **THE COURT:**  -- I'm only looking at the case or

20   controversy that's right before me.  I do hear some arguments

21   for something else, but that's not what I'm doing here.  I'm

22   only looking at the standard here.

23             **MR. JAVITCH:**  I agree, Your Honor.  The background is

24   that this -- the group of companies operating have never had a

25   class action certified because they've never produced --

1    they've always claimed that they've never had the logs.  And

2    that's been the strategy that has been willing that -- to get

3    these larger companies to be able to do this strategy in

4    business by having the downstream sellers do the dirty work and

5    then lose all the records.

6            And so there's just no explanation for conclusory

7    boilerplate responses, when you know, we have the evidence that

8    shows these documents existed.  If the -- you know, the

9    responses should have admitted that they once existed but they

10   were lost in the fire, if that's the case.

11           **THE COURT:**  All right.  Thank you.  To both sides,

12   I'm going to take my recess at this time and I'll just come

13   back in a moment.  I want to look at some things on the record,

14   so I am going to take a recess.

15           All my questions thus far have been answered.  And,

16   in fact, hopefully you've been able to express the things that

17   you'd like to be able to talk about.  Anything else you wanted

18   to say really quickly, because again I'm going to take my

19   recess?

20           **MR. SILVERMAN:**  I can wait until after the recess.  I

21   just wanted to cite some authority from the Court's order, the

22   contempt order in November, but I can do that when you come

23   back.

24           **THE COURT:**  Okay.  Thank you.  I'm going to take my

25   recess then at this time.  Thank you, everyone.

34

1           **MR. JAVITCH:**  Your Honor, maybe I could just tell you

2    one more thing.  The -- we do have a deposition scheduled for

3    March 11th, so we intend to ask -- follow up on this search,

4    just so the Court is aware.

5           **THE COURT:**  Yes, but is that something that's before

6    the Court?

7           **MR. JAVITCH:**  Well, no, sorry.

8           **THE COURT:**  No, there's no sorry.  I'm just -- when I

9    ask a question, it's just a question.  It has no intent behind

10   it.

11          **MR. JAVITCH:**  Well, I just meant --

12          **THE COURT:**  I just am saying, is that part of

13   something I can consider here that is relevant to this, because

14   again sometimes you come out on a motion on issue A, and then

15   it becomes an omnibus motion talking about issues B through G

16   that are not before the Court, that have not been presented to

17   the other side.

18          I just want to make sure that what I'm always doing

19   is handling only what's before me.  I only have this contempt

20   right now.  So I'm not sure what you mean by we want to be able

21   to do this deposition on this day.  That sounds like another

22   issue for another day.  I'm just deciding the contempt issue

23   now.  Does that sound about right?

24          **MR. JAVITCH:**  I just wanted the Court to be aware and

25   if you wanted to wait until after we had, you know, deposed

1    about the search, but if that's not what the Court wants, I

2    didn't mean to raise it.

3        **THE COURT:**  No, and that makes sense.  I do

4    understand what you mean in that way.  Do you have any response

5    to that, Mr. Silverman?

6        **MR. SILVERMAN:**  My only response is that further

7    showing the compliance and the willingness and the substantial

8    compliance is that counsel asked for that deposition and even

9    though I don't think it's appropriate, they should have taken

10   that deposition a year ago after the amended responses were

11   served, I willingly accepted service and Mr. Samararatne is

12   willing to appear on March 11th to answer the questions.  I

13   think that actually supports our compliance and the lack of

14   contempt and the other way around.

15       **THE COURT:**  And before I go in the back then, is

16   there any request then?  I'm not going to presume because I can

17   hear inferences and possibilities of bringing that up from both

18   sides, but this is what's on for today.  I've seen no other

19   requests.  So what are the parties looking to do by bringing

20   that up?

21       For example, it sounds like, do you want me to

22   continue this OSC?  That's what it kind of sounds like but.

23       **MR. JAVITCH:**  Well, I think we have enough on the

24   evidence but if the Court -- if that's -- you know, I can show

25   you the e-mails and the regulatory action print outs that I

36

1    have.  But if it's -- you know, if the Court wants a fuller

2    record, that's a possibility too.

3           **THE COURT:**  Here's what this is.  I hear this kind of

4    often, if the Court wants.  I don't have a burden here.  It's

5    not what I want, that's up to you.  I am a third party neutral

6    who sits back and I'm a receiver of information.  I think in

7    some countries I've done comparative analysis, it's like a

8    grand inquisitor as a judge.  They go out, search things, they

9    go along with the parties, I've even seen where it seemed like

10   the judge is doing more than the parties, and when I read books

11   and things, but that's been a while.

12          It's -- that's why I asked, what you want to do.  I

13   don't want anything.  I just decide the case or controversy

14   before me.

15          **MR. JAVITCH:**  I'm sorry, Your Honor.  I don't wish to

16   ask for that at this time.

17          **THE COURT:**  Okay.

18          **MR. SILVERMAN:**  Yeah, we don't want a continuance

19   either.  We think that based upon the record and what's been

20   presented that the burden clearly has not been met.

21          **THE COURT:**  Okay.

22          **MR. SILVERMAN:**  I wanted to explain that, but I'll do

23   that after the break if Your Honor wants.

24          **THE COURT:**  Okay.  I don't have any further

25   questions.  I have a record at this point, but I'm going to

37

 1    come back out and -- but I'm going to take a recess now.

 2            All right.  Thank you, everyone.  We'll be back in

 3    just a few minutes.  If you'd like to step out for no more than

 4    ten minutes, you may do so.  Thank you, everyone.

 5            **MR. SILVERMAN:**  Thank you, Your Honor.

 6            **THE COURT:**  And that's to everyone in the gallery as

 7    well, thank you.

 8        **(Recessed at 10:48 a.m.; reconvened at 10:56 a.m.)**

 9            **THE COURT:**  I'll call it.  Everyone ready?  Thank

10    you.

11            We're going back on the record in the matter of Kurt

12    Morales, II, et al versus Vajira Samararatne.  This is Case

13    SAMC-24-00010-FWS-DFM.  And may I have counsel's appearance

14    again at this time.

15            **MR. JAVITCH:**  Mark Javitch for plaintiffs.

16            **THE COURT:**  Thank you.

17            **MR. SILVERMAN:**  Dan Silverman for Mr. Samararatne.

18            **THE COURT:**  All right.  Thank you.

19            The Court has taken its recess.  I'm ready to rule at

20    this time.  But, Mr. Silverman, you said there was additional

21    that you wanted to say.  If you want to say something, I'm

22    going to have to have you limit your time.

23            **MR. SILVERMAN:**  It'll be one minute, Your Honor.

24            **THE COURT:**  All right.  Thank you.  Then you may

25    proceed.  Then you'll have a minute of time as well, thank you,

1    to the plaintiff.

2         **MR. SILVERMAN:**   I just wanted to read from the

3    Court's -- the magistrate's November 21st, 2024 order in terms

4    of the standard for issuing contempt.  The Court said,

5              "In making a contempt determination, a Court

6              may consider the witness' history of non-compliance

7              and the extent to which the witness failed to

8              comply during the pendency of the motion for

9              contempt."

10        Citing the Martinez v Avondale case.  We've complied

11   to the letter and to the spirit of the order during this entire

12   process.  He retained me.  We complied.  We did exactly what

13   was ordered.

14        In that same order, the Court said,

15             "A civil contempt order must be accompanied

16             by a purge condition, meaning it must give the

17             contender an opportunity to comply with the

18             order before payment of a fine or other sanctions

19             become due."

20        And the Court cited the -- I can't pronounce it,

21   Conan Colege Phillips (phonetic) case, a Ninth Circuit case,

22   2008.  Again, we have complied with the order and the purge

23   condition must apply here.  Finally, the Court cited the Shell

24   Offshore v Greenpeace case, another Ninth Circuit case, saying,

25             "The ability to purge is perhaps the most

39

1              definitive characteristic of coercive civil

2              contempt."

3          So again, under the Court's order the purge is

4    required, there's been no prior contempt, and Mr. Samararatne

5    has complied fully during the contempt proceedings once he knew

6    of them and got served with the order on January 7th.  That's

7    all I had to say.

8          **THE COURT:**  Thank you.  To plaintiff, Mr. Javitch, if

9    you'd like to respond.

10          **MR. JAVITCH:**  Thank you, Your Honor.  I'll just stand

11    on what I already said about why we believe it was not

12    compliant and the knowledge that he had of when he received it.

13          **THE COURT:**  All right.  Thank you.  Is this matter

14    submitted?

15          **MR. JAVITCH:**  Yes, Your Honor.

16          **MR. SILVERMAN:**  Yes, Your Honor.

17          **THE COURT:**  Thank you.  To the parties, I greatly

18    appreciate your arguments.  Thank you so much.  The Court has

19    considered everything very carefully.

20          As I said, I listen word by word and always read

21    things page by page.  So thank you of that.  And the matter

22    having been submitted, the Court rules as follows.

23          Based on the current state of the record as applied

24    to the applicable law, the Court cannot find by clear and

25    convincing evidence that one, respondent violated a specific

40

1  and definite court order.  And two, beyond substantial

2  compliance; and three, not based on a good faith and reasonable

3  interpretation of the order, citing to In Re Dual-Deck

4  videocassette recorder anti-trust litigation, 10 F3d 693 at

5  695, the Ninth Circuit case from 1993.

6          Indeed, the record sent to Magistrate Judge McCormick

7  issued the July 8th order has changed substantially.  And what

8  remains between the parties may appear to be a discovery

9  dispute and not a contempt matter, but in any event, the

10  elements have not been met.

11          For the Court to find contempt by clear and

12  convincing evidence, accordingly, the Court at this time

13  discharges the order to show cause.

14          Again, I want to thank everyone for taking the time

15  with the Court today for your very thorough arguments and

16  answering the questions so responsively.  Thank you so much.

17  And anything else I can do to help the parties?

18          **MR. SILVERMAN:**  No, thank you, Your Honor.

19          **MR. JAVITCH:**  Thank you, Your Honor.

20          **THE COURT:**  Everyone have a great day.  Thank you so

21  much.  Everyone please be well.  Take care now, thank you.

22      **(Proceedings concluded at 11:01 a.m.)**

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    **March 7, 2025**

       **Signed**                                                    **Dated**

*TONI HUDSON, TRANSCRIBER*